case number is 25-3216. Thank you. If everybody's situated, Mr. Massey, it looks like you've reserved two minutes for rebuttal. You may begin whenever you're ready. Thank you. Good morning. May it please the Court. The Connecticut drug price cap is both unconstitutionally extraterritorial and protectionist. It creates two prices, a lower in-state reference price for covered drugs, and then a higher out-of-state price equal... How does it create a higher out-of-state price? Well, by segmenting the market that way, by allowing the WACC wholesale acquisition cost to increase. The price flaws in Healy and Brown Farm and in Baldwin didn't also create additional out-of-state prices. You said it created an out-of-state price. Okay, well, it created a system where there are two prices. One is lower in-state and one is higher out-of-state. And no appellate court has ever upheld a price control law like that. There are three points I'd like to make, first relating to the exemption of in-state retailers, then to the exemption of manufacturers, and then Section 374, 347, pardon me, the compelled shipment provision. Is it your position that any price cap imposed by a state violates the Dormant Commerce Clause? Not every single one. In interstate trade, generally, yes, I think it would. And there have been price caps imposed on milk oftentimes, but that's happened for over a century, right? Well, they've been struck down a lot. I mean, the Dean milk case, the Baldwin case involved milk. I mean, if you do... All right, but your position here is not that a price cap standing alone violates the Dormant Commerce Clause? Not necessarily, but in many instances, it would balkanize the market and create the opportunity for state retaliation. I mean, imagine gasoline today. If your position is that it's not categorically off the table, then how is this case different than pork producers? So that did not involve a price cap, but it did involve a situation where the law that was at issue affected out-of-state pig farmers, because that's where they all were, and had a disproportionate effect on those pig farmers. But the court, nevertheless, said that there was not a problem because there was no discrimination against out-of-state interest purposefully in the law. So how do you... Correct. Well, a couple of levels. First, just doctrinally, the court obviously reaffirmed T. Lee Brown Farm and quoted the statement in Walsh that a state price control that ties in-state prices to out-of-state prices would still be unconstitutional. I think the message of pork producers is that price control laws are different, and when you have a price cap, it's inherently discriminatory, inherently protectionist. And the cases since pork producers that the state has relied on draw that distinction between price controls and other kinds of state laws. And I think the reason is the second sort of common-sense reason for distinguishing pork producers is when California has a humane, you know, a humane slaughtering law, that will raise the cost of pork in California, and California consumers will pay it. But it doesn't necessarily export that cost to other states. A price control law automatically does that. As this Court recognized in the HDA against Zucker case, which was the opioid cost pass-through prohibition, that if you limit the cost, the price in Connecticut, you are pushing costs onto consumers in other states. And I still don't understand how that's the case. And in the pork case, the court the argument made there by the plaintiffs was precisely that the costs, they would bear additional costs by having to re, you know, redo their farms to make sure that the pigs were kept within the proper space that's required by California law. And the court said, well, yeah, it may cost you more to produce, you know, meat that's compliant, but that doesn't affect the dormant costs. So I'm still trying to understand how a cap in Connecticut increases the costs outside of Connecticut. Well, because every, distributors lose money on every transaction. So those are costs that are going to be recovered somewhere. They are going to be recovered outside Connecticut because they can't leave Connecticut under Section 347. They can't get out of this dilemma because, and in California's example, yes, California consumers will pay more. But here, it's going to be people outside the state that have to pay more. And the reason is, as I mentioned, Section 347, which the state has never justified, this is the compelled shipment penalty. It says if you stop shipping drugs into Connecticut, there's a penalty of $500,000 per covered product. Now, there are thousands of covered products. So if a distributor tried to leave Connecticut altogether, it would face truly astronomical expenses, penalties. So if we severed out that provision, would that cure any dormant commerce clause problem? Well, I agree that the issue is one of severability. And, you know, and then, which hasn't been briefed. And so we could, you could send it back to the district court to have a hearing on severability. There's a presumption of severability under Connecticut law. But then there are cases like Seals v. Hickey, which is a 1982 decision by the Connecticut Supreme Court that cautions courts against rewriting legislation and coming up with a new statute that the legislature never intended. And I think... Wasn't the withdrawal provision added later to the statute, almost like an afterthought? I don't think so, Your Honor. I think it was from, in the statute, from the very beginning. And I think it's central to the statute because a price cap won't work if people just leave. That's what the distributors would do. Connecticut's not a big state. And the distributors, if faced with nothing... So maybe you could put an end to that for a second. Yeah. Okay. So just talking about the out-of-state impact of the law here, how do you deal with cases like Vizio, Walsh, Freedom Holdings that talk about the upstream effect of the law's impact not being dispositive or even mattering for the extraterritoriality issue? Well, none of those... Those cases there. None of those are price control cases, Your Honor. Vizio is a recycling fee that was calculated according to the national market share. What about Walsh? That was a rebate. Walsh, in Walsh, the district court struck down the price control provision. The state did not appeal that. That part of the law was always unconstitutional. The only thing that went up on appeal was the Medicaid negotiation provision, which isn't the same, completely different. Well, wasn't it a rebate that went to in-state pharmacists to subsidize local consumer purchasing? But it's not a control about prices. It was a... We concede, frankly, one of the tools open to Connecticut would be a drug price negotiation program that could also give tax subsidies or aid to consumers so they could afford drugs more. Those are all perfectly permissible tools. The... The price cap is the key. And I do... But the law affects transactions that take place within Connecticut. So that doesn't preclude a distributor from selling outside of Connecticut and the pharmaceuticals wind up in Connecticut, correct? Well, it does... Correct. But there is... The evidence in the record at A56 to 67 is that taking title outside Connecticut is a non-starter, because Connecticut customers insist on having... And federal regulations require a chain of custody for things like narcotics. You can't just send them to have... Take title wherever you want. It has... It's a strictly controlled system. So the idea that distributors might shift is a non-starter. But I would like to make... Since the Act... I just have one question. Yes. Since the Act went into effect in January 1st of this year, can you point to any drugs that distributors have actually had to sell at a loss? Well, we have... I mean, I understand your argument is you're not making the profit you hope to be making, but have you actually sold drugs at a loss? Yes. There are 650... As of January 2026, there are 650 drugs, covered products, which... For which WAC has increased higher than the reference price. And so those are all being sold in Connecticut today at a loss. But I thought that the distributors negotiate a price that's below the WAC. No. WAC is the driver of the... It's the metric that drives the price. They sell pharmacies, especially branded drugs, at WAC, essentially. There is a... The situation with respect to generics is a little bit different. Of course, the State hasn't developed any evidence on that. But what we put in the record, which is A56 to 67, and... I'm sorry. The evidence about WAC increase is really A48 to A55, is that the 650 drugs, covered products under the statute, have a higher cost to the distributors than their selling price. So they are losing money on each of those transactions. I would like to say that this isn't a price... I looked for that, and I didn't see it. Well... But what page are you saying is proof that they're selling at a loss? Well, the WAC increases are in the record at A48 to A55. And the calculation of the 650 covered products is an updated reference to the same websites that are cited in those pages. And at that point, the WAC price is higher than the reference price, even in counting for inflation. So those products, which are being bought and sold, the branded products are bought and sold at WAC, are being sold at a loss by distributors. But we're assuming that they're being purchased at the WAC level and not at a negotiated level lower than the WAC, correct? Yes, that's correct. Although the State hasn't developed any evidence at all about that. And the evidence the State has... The State developed, aside, only hearsay evidence about the negotiation process. If you look at the State's evidence, it says that the margins for distributors are razor thin. They're 0.5%. The negotiations that their secondary sources talk about involve a 2%... a 2% discounts that might be incurred. So even at counting all of that, giving the State all of the benefit of all of that, the WAC has increased faster. So they're still being sold at a loss, even if you believe everything the State says. I would like to say that we don't need to prove that we're losing money in order to have a Commerce Clause violation. There was not a proof of loss of money in either the Fourth Circuit or the Eighth Circuit cases, which involved price gouging rules, not a price cap. There was no proof of loss in Healy or Brown-Forman, which involved loss of promotional programs. I see them over time. Counsel, let me ask you about your theory of Commerce Clause violations. We have three basic theories. National Shooting Sports summarized them, under which you can say the Dormant Commerce Clause is violated. You started today by pointing to two of them, protectionism and extraterritoriality. The three options are protectionism, which is a form of discrimination, extraterritoriality, and undue burden on interstate commerce. Correct. In your complaint, you assert an extraterritorial claim specifically as a count, and you assert an undue burden claim, which appears to have been abandoned, as a separate count. The complaint doesn't seem to me to raise any arguments about protectionism or discrimination against out-of-state commerce. Well, we believe, after Port Producers, essentially protectionism and extraterritoriality converge, and I don't think — Well, National Shooting Sports is — Well — — says there's three separate types. I understand that. And, like, the word protectionism isn't in your complaint. Well, you know, I actually don't know if that's — looking back, I don't know. But — I can tell you it's not. Okay, it's not. But I don't think — look, I don't think for pleading standards you have to even mention, frankly, a legal theory. No, but what I didn't hear about your complaint is you actually have a separate count, and it says — We do. — this statute violates the Dormant Commerce Clause because it is extraterritorial. And then you have a count that says this statute violates the Dormant Commerce Clause because it imposes an undue burden. And so you in your own complaint have framed this as though those separate theories are separate causes of action. But yet, you haven't pled anything that looks to me like a protectionism claim at all. Well — And that's what you're focused on now. Well, we're focused on the discrimination in favor of in-state consumers — Which is the protectionism — — which is the protectionism point. But I know the complaint also discusses the — It doesn't say discriminate either. Well, not in the — not in the count, perhaps. But throughout the complaint, the factual allegations, Connecticut giving its own consumers a cheaper deal than the consumers in other states. And it's actually not even doing that. My question for you was, why did you plead those as separate causes of action if you don't believe that different theories of Commerce Clause liability are separate causes of action? Oh, well, we pled it that way because we thought the Pike undue burden test is going to — it was a factual — is a factual test, fact-intensive test that would require discovering the development of a record. So your claim is that your count that is about — that says it's extraterritoriality actually encompasses a protectionism claim? Yes. Yes. I mean, our theory in pleading was one count that doesn't require facts because we're filing in October, we need a decision by the end of the year. Count two is — we didn't abandon it because we didn't seek a PI on it, but we haven't dismissed the case. The case is still — But it's not an issue on appeal. It's not an issue on appeal because it would, admittedly, require discovery. We'd have to prove undue burden. So in terms of discrimination, the State says, look, out-of-state consumers can come into Connecticut. They get the benefit of any prices in Connecticut. Distributors, if they set up shop in Connecticut, they would be subject to the same law that the out-of-state distributors are. So there's no discrimination. And so why isn't that kind of the end of the — at least that prong of the argument? Well, the first point about consumers coming in, that's exactly — that's the Commerce Clause violation. What the Supreme Court has said is that if you give — if you force consumers to come into your State to do their business, that is what the Commerce Clause is going to stop. Well, if you want the price, you come in. I mean, if you like — Well, people do that for gasoline, for liquor, for cigarettes all the time. They cross State borders because they can get it cheaper across the State. And that's a great point, Your Honor. That is exactly right. And those price differences, though, are not the product of price caps. Imagine if they were. Imagine if every State — if you give Connecticut license to do this law, any State could cap the price of gasoline or groceries. Part of your argument, though, about the Act being discriminatory is that you compare in-State retailers to out-of-State distributors. You're comparing apples and oranges. The Act doesn't — applies equally to distributors out-of-State and in-State. So how — getting to the point that Judge Subermanian asked you, how is it discriminatory when it applies to all distributors? Well, first, two answers. One, the fact that — the retailer example is a great example, because in-State retailers are not bound by this law. This law is really a markup law for in-State retailers. It's a license to take the lower price that the distributors have to sell at and then keep the same price that they're selling at now. So it discriminates against distributors in favor of retailers, it now sounds like you're saying. It does, certainly. But is that what the — is that what the Dormant Commerce Clause prohibits? Well, the Fourth Circuit and Frosch thought it did. That's what — and the Supreme Court said that Frosch read Brown, Foreman and Healy in the same way as the Supreme Court did. And the second answer to Judge Kahn's question is that, yes, if you have a discrimination in favor of an in-State interest — I mean, if you look at, like, the Camps — the Camps Atuana case or the Oregon Waste Systems case in the Supreme Court, where the Supreme Court said discrimination simply means differential treatment of in-State and out-of-State economic interests that benefits the former and burdens the latter. Don't they have to be similarly situated under cases like General Motors? They do have to be similarly situated. But when you have the context of a price control law, what could be more similarly situated than two sellers in the same chain of distribution? So General Motors focused on competition between the out-of-State and in-State interests. There are a lot of other cases that also focus on competition. Do you have a case that says you can have similarly situated entities despite the lack of direct competition between the out-of-State and in-State interests? Well, that's the Fourth Circuit and Eighth Circuit cases, where there was no in-State distributors in either case.  I understand that. That's a good segue, because Ellison and Frosch, which you say there's a circuit split, obviously in those cases the principal issue that the courts identified is that the law is applied to out-of-State transactions between a manufacturer and a distributor, which could cause all sorts of issues with conflicting State law requirements, given that nobody might know that a particular drug was going into the State ahead of time. And that's what Connecticut severed out or took out of this law, right? And so why doesn't that mean that there's no circuit split and there's no issue really with Ellison and Frosch? Well, because Frosch specifically did say even if there had been a sale into the State from the out-of-State distributor, that would not be enough to justify the Maryland law. That's at page 671 of Frosch. The Court notes that. But that's given the fact that the out-of-State transaction was covered, right? Because there's an even broader version of the law that if a drug could come into the State, then the out-of-State transaction would be covered. But in Ellison, it makes clear that even if you were to limit it to drugs that ultimately go into the State, that's not enough, because it still covers directly the out-of-State transaction. Well, that's Ellison. That's right. But Frosch also, in a couple of paragraphs later from the part you're talking about, the Court says even if there were a nexus here, even if there were an in-State sale by the distributor, that would not be enough. It's tracking Brown-Forman, which says at page 580 and 583 that the fact of an in-State sale is, quote, unquote, irrelevant. And the Supreme Court in Pork Producers actually quotes the same language. But I'd like to point out that the manufacturers here are exempt. This law is not like — is even worse than the Eighth Circuit law, because now the two entities which have the most control over prices, the in-State retailers which sell to consumers and the out-of-State manufacturers which set and control WAC, neither is covered by the law. So that's why we raised the equal protection rational basis argument at the preliminary injunction hearing when the State adopted this 11th-hour reinterpretation. Zucker is a great case for you. Do you have a circuit or Supreme Court case that is similar to Zucker in that it applies to an in-State price control or price cap and says there's a dormant commerce clause violation despite the fact that it doesn't reach out-of-State transactions, anything of that kind? Well, the next best cases would be Brown and Williamson in 2003 and Sorrell in 2001 from this Court that talk about States exporting the regulatory costs of their programs onto consumers in other States. And that, I think, is what's happening here. Thank you, counsel. We'll hear from you again. And we'll hear next from the State, Mr. Britt. Good morning, and may it please the Court. My name is Joshua Britt, and I represent the appellees here. May I ask you to speak up just a little bit? Yes, sorry. I represent the appellees here, the Commissioner of the Connecticut Department of Revenue Services and the Connecticut Attorney General. This Court should affirm the decision of the District Court denying HDA a preliminary injunction primarily because HDA has failed to establish a likelihood of success on the merits of its dormant commerce clause claim. And we're reviewing for an abuse of discretion here, right? That's right, Your Honor. In Sections 345 to 347 of Public Act 25-168, Connecticut capped the sales price of certain drugs that are sold by manufacturers or distributors inside of Connecticut. This drug price cap only applies to sales in Connecticut. And so I want to say three things about this cap today. The first is that after national pork producers, any extraterritoriality claim has to show that the law is protectionist or discriminatory. And the second thing I want to say is that HDA has failed to establish that this law, the Connecticut price cap, does either of those things. Its commercial discrimination theory, as this Court recognized, makes an inopposite comparison between retailers and distributors, which are not competitors. The retailers are the customers of the distributors. And on the consumer discrimination point, the real trouble here is there's a lack of evidence about what will actually happen in other states in response to the cap. When we look at Brown-Forman and we look at Zucker, for example, those cases had a certain effect on out-of-state pricing based on the text of the law. There was no need for evidence on how prices might shift in other states in response to the cap. Here, as this Court, you know, observed, the cap treats all entities the same, regardless of their residency. Do you concede that, obviously, your office or the Attorney General took the position that it would not apply, that it would only apply the law to transactions entirely occurring within Connecticut's borders? Do you agree that, but for that change stipulation, there would have been a dormant Commerce Clause concern? There would have been a concern, Your Honor, yes. So if Connecticut sought to apply its price cap to a transaction between an out-of-state manufacturer and a distributor, say in New Jersey, for example, and then sought to hold the manufacturer liable for the price it charged in that transaction in Connecticut, that would look a lot like the laws in Frosh and Ellison, which were found to have dormant Commerce Clause problems. Frosh was pre-PORC, and so there's a question there about whether the plaintiff in Frosh would also have needed to show discrimination, which wasn't discussed in Frosh. And Ellison also didn't really address discrimination because it read PORC as preserving price control. How do you respond to your opponent's argument that basically he was arguing that you have the burden and you have not shown that distributors who are selling the drugs that the statute applies to within Connecticut borders are negotiating a lower than a reduced price from the WAC? How do you respond to that claim? So I think the problem with that argument, Your Honor, is it kind of inverts who has the burden here. So we're up at the Second Circuit because HDA has sought a preliminary injunction, and so they have a burden, an evidentiary burden, to establish a likelihood of success on the merits. And to the extent they rely on this cost-shifting argument, they have an evidentiary burden to establish what costs they're actually paying, which, as Your Honor pointed out, is not in the record. There are affidavits about WAC price increases, but there's no record evidence on the price distributors actually pay. And that matters because we cite a case in our kind of discussion of the facts section in the brief that points out that distributors often pay far below WAC. And I even heard my colleague characterize WAC as a benchmark or a reference price rather than a price anyone actually pays. All right. Can you point to any dormant Commerce Clause case sustaining a price cap of this kind? I can't point to a dormant Commerce Clause case, Your Honor. There are a couple of Supreme Court cases that have talked about price control laws generally.  So if you can't point to a case, then I think what Mr. Massey is saying is, let's compare this case to pork producers. And he identifies at least four differences, so I'd like you to address these. One, you have a price cap at issue here as opposed to a quality standard. Two, it's conceded that there are no distributors, meaning that affected interests are wholly outside of the state. Three, those affected out-of-state interests cannot withdraw from the market. They can't go somewhere else and refuse to sell. They're locked in. And fourth, they cannot impose their price increase on citizens of the state. They can only impose them on citizens outside of the state. And how is it that without any case that sustains a price cap under the dormant Commerce Clause, that taking those four factors into consideration, that is in a violation under the Supreme Court's cases? So I'll take those factors and turn your Honor in the same order that you presented them. So first, addressing the price cap. So I don't agree that there's a special rule that applies to price caps. If we look at pork, pork characterized Healy, Brown, Foreman, and Baldwin, and this is on page 374, as laws challenged statutes that had a specific, impermissible, extraterritorial effect. Pork didn't say that the laws in that case were a problem simply because they operated as price affirmation or price control statutes. The court in pork focused on the effect. And so that's kind of what's left of extraterritoriality are these specific effects. Your next factor, Your Honor, was talking about commerce wholly occurring wholly. In the fact that there are no out-of-state, the affected interests were wholly out-of-state. At least in pork producers, there were some pig farmers in the state. But here, they are all outside of the state. So when it comes to the kind of two ways to look at that, Your Honor, one through the extraterritoriality lens and the other through the discrimination lens. So through the extraterritoriality lens, after pork, we still need some protectionism or discrimination, and we also need, as this court noted in Visio, a law that directly controls out-of-state commerce. And so what matters for the extraterritoriality analysis is where the transaction occurs and whether the law seeks to impose liability based on an out-of-state transaction or not. The residency of the companies doesn't matter so much for the extraterritoriality doctrine. For example, a company that's headquartered in Connecticut that makes a sale in California, if Connecticut seeks to regulate that sale, even though it has nothing to do with Connecticut itself, that could potentially be an extraterritoriality issue of the kind we've been discussing. So residency doesn't matter as much as where the transaction occurs and whether the law seeks to regulate it. And why don't you move to withdrawal? Because Mr. Massey in his brief points out that the state doesn't even respond to the withdrawal requirement, and it seems very unique that in all of these dormant commerce clause cases, the court is often saying, well, if they don't like the law, they can move to a different state. They can vote with their feet, but here they can't. So why isn't that a violation? So the withdrawal penalty in this case, Your Honor, imposes a penalty only if the distributor seeks to withdraw to avoid paying the civil penalty that's assessed if they sell a drug in Connecticut above the reference price. So it's not a complete ban on withdrawing the drug under any circumstances. So you're here representing that they can, Mr. Massey's clients, can stop selling drugs in Connecticut, no harm, no foul. Not in all cases, Your Honor. So the way we read that is that it does prevent the distributors from withdrawing to avoid the cap. So what I mean by that is if they want to sell above the reference price, but they don't want to pay the penalty and they don't want to sell below the reference or at the reference price because they'll sustain a loss in every sale, that's the situation in which they can't withdraw, when the mathematics don't work out. But if, for example, they have no contracts with Connecticut retailers to provide them those drugs, there's a shortage and they're unable to obtain the drug, in those situations, there's no issue with a distributor ceasing to distribute a drug. It's only a specific kind of withdrawal. And do you have any case supporting that no withdrawal provision under the Dormant Commerce Clause? I don't, Your Honor. And then turning to your next point, Your Honor, I think— The last point was imposing prices on Connecticut customers, and the court in Zucker focused on that as being one of the principal reasons why the New York opioid tax violated the Dormant Commerce Clause. And I didn't see a response to Zucker in the briefing. I'm going to miss it, but maybe I'll give you an opportunity. Thank you, Your Honor. So there are two points I want to make about Zucker and about the cost-shifting argument more generally. The first is a legal one. The second is an evidentiary one. So on the legal point, in Zucker and also in Brown-Foreman, the effect of the law at issue on out-of-state prices was certain from the face of the law. So in Brown-Foreman, for example, a distiller had to charge in New York its lowest price in any other state. So you could just look at the text of the law and know what was going to happen in other states because of it. Similarly, in Zucker, the New York law in that case imposed a fixed assessment on manufacturers and distributors each year that was a calculable number kind of based on their opioid sales. And there was a pass-through prohibition. That number could not be recovered from the customers. And the court in Zucker, when talking about limiting that pass-through prohibition just to New York customers, noted then that there's a fixed amount here the distributors and the manufacturers have to pay. They can't recover it from in-state consumers in New York, so inevitably they're going to have to recover that cost from out-of-state entities. We don't have that kind of inevitability here, right, because the law doesn't say anything about how distributors can recover this cost. And that takes me to my next point, which is the evidentiary problem. Even assuming which isn't established in the record that distributors are now or will in the future book a loss in Connecticut on the products that are covered by the cap, the cap doesn't prevent them from recovering those costs in-state. And it's not clear what will happen out-of-state as a result of the cap. There's nothing in the record about the prices out-of-state or what distributors might do in response. So if we look at the affidavit. So you're saying they could sell the drugs that are not covered by the price cap. They could sell other drugs in-state at a higher price to recover their loss? Or even other products, Your Honor. I point the Court to page 66 of the appendix here. So that's an affidavit from McKesson, one of the three largest distributors in the country. In that affidavit, the employee for McKesson notes that the products that are covered by the cap are a small subset, and that's a direct quote, of the products that McKesson distributes nationally. And the cap doesn't prevent, for example, the distributor from recovering any losses on covered drugs by selling other products in Connecticut that are not covered by the cap at a higher price, essentially spreading the cost out. And this would have the kind of policy effect of reducing price spikes on critical drugs and kind of spreading out that cost among other health care products. Now, I don't know if distributors will do that or not, and that is kind of the evidentiary problem here, is they have the burden when moving for a preliminary injunction to establish what they would do with their pricing in other states in order to support their consumer discrimination theory. All right. Thank you, counsel. Thank you. Can you reserve, Mr. Cassie, two minutes for rebuttal? Thank you, Your Honor. Three points. First is there's no defense of how the law actually works. The retailer exemption, the idea that manufacturers are outside the cap, both of them are able to increase prices as much as they want. This law is fundamentally not a price cap law. It's a retailer markup law. It can't even pass rational basis. Second, on Section 347, the compelled shipment provision, what I heard is the distributors can't withdraw in order to avoid the cap. So their choices are to sell at a loss, transaction by transaction, or to beg pharmacies or manufacturers for some better deal that will enable them to stay in Connecticut. That's fundamentally not consistent with the Commerce Clause, to tell an out-of-state company you have these kinds of Hobson's choices. I mean, that's the Morales case. This is a provision at minimum that must be held unconstitutional, and if you want to perform your own severability analysis, because I do think this is an integral part of the Act, I think it is non-severable, or remanded to the district court, that seems at minimum what needs to happen here. Third, on the issue of facts and who has the burden and so on, let me make clear that the Commerce Clause argument does not depend on our documenting that we're selling at a loss or that we'd be driven out of business. That's not the standard that applied in Brown form, in Arhealy, or Frosh, or any of the other cases. But if you want to see will we have to sell at a loss, it's actually in the record. At A46, paragraph 6, there's a declarant who says we will have to sell at a loss after this law. Now, the last argument my friend on the other side made is we could spread costs among other products, but that compounds the Commerce Clause violation by interfering, balkanizing the market further, and that's like telling a gas station we're going to cap the price of gas, but you can sell diesel. If Connecticut can do this law, Kentucky could do a price floor for bourbon to protect its industries. Other states might adopt rules to raise the price of Mephistophan, or ethically sourced products, or environmentally sustainable products. And that would result in hobbling distributors across the country and creating the very balkanization that the Commerce Clause was meant to prevent. Thank you. Thank you, counsel. Thank you both. We'll take the matter under advisement.